## AFFIDAVIT OF SPECIAL AGENT MATTHEW J. MCCARTHY

I, Matthew J. McCarthy, having been duly sworn, do hereby depose and state as follows:

1. I am a Special Agent with the United States Immigration and Customs Enforcement ("ICE"). I have been so employed since January 5, 2004. Among other duties, I am assigned to investigate the manufacture and sale of fraudulent resident alien cards, also known as Form I-551 (hereinafter "green cards"). Based upon my training, I know that people manufacture counterfeit green cards and social security account number cards ("SSANC") and other false identification documents, and distribute and sell such documents to aliens who are illegally present in the United States. I am familiar with the various criminal statutes which make it unlawful to manufacture and distribute such documents, including Title 18, United States Code, Section 1028 (a) (1) – (6).

2. Based on my experience in this and other fraudulent document investigations, I am familiar with the tools, equipment and materials necessary for the manufacture of counterfeit green cards and SSANCs. I am aware that the common types of equipment and materials used to manufacture such documents include computers, computer printers, computer document scanners, color copiers, typewriters, plastic laminate, sealing mechanisms, ink pads, blank alien registration cards and blank social security cards.

3. For the purpose of this affidavit, the term "computer" refers to the box that houses the central processing unit ("CPU") along with any internal storage or communication devices (including but not limited to hard drives, internal modems, and fax cards) and any other hardware, software, and data contained in the main unit. The term "peripherals" refers collectively to printers, external modems (attached by cable to the computer), monitors, scanners, and other external attachments. The term "computer system" refers to the computer and all peripherals as one package. The term "information" refers to all the information on a computer system, including both

software applications and data.

4. This affidavit is based on my personal knowledge, information provided to me by agents of ICE, and information provided to me by confidential informants ("CI"). This affidavit is not intended to set forth all of the information that I and other law enforcement personnel have learned during this investigation, but is submitted in support of an application for (1) a criminal complaint against Alex Last Name Unknown, charging him with violating 18 U.S.C. § 1028 (a) (2) (transferring fraudulent documents); and (2) a search warrant for the first floor left apartment located at 345 Washington Street in Weymouth, Massachusetts.

**BACKGROUND:**

5. In December 2004, I received information from a confidential informant ("CI#1") regarding a male named "Alex" Last Name Unknown, who was allegedly involved in the sale of counterfeit green cards and SSANCs in the Weymouth, Massachusetts area. CI#1 provided me with a cellular telephone number of (781) 901-9525 to contact "Alex" for the documents.

6. On February 28, 2004, a different confidential informant ("CI#2"), placed a consensually monitored and recorded telephone call to (781) 901-9525 and spoke with a man named "Alex" about obtaining fraudulent green cards and SSANCs. "Alex" advised CI#2 that he could assist him/her in obtaining such documents for $120.00 a set, with one green card and one SSANC in each set. "Alex" informed CI#2 that he would manufacture the documents for him/her and take the photograph used in producing the green card if CI#2 did not have one available. "Alex" and CI#2 agreed to speak at a later date.

**THE FIRST DOCUMENT PURCHASE**

7. On March 7, 2005, CI#2 placed a consensually monitored and recorded call to "Alex" at the aforementioned cellular number to arrange the purchase of the fraudulent documents. After making contact with "Alex," CI#2 inquired about obtaining two

sets of counterfeit green cards and SSANCs. According to CI#2, "Alex" agreed to accommodate the request. As a result of this telephone call, "Alex" and CI#2 scheduled a meeting for 10:30 a.m. in the parking lot of Shaw's Supermarket on Route 53 in Weymouth, Massachusetts.

8. At approximately 10:00 a.m. ICE agents met with CI#2 in Weymouth, Massachusetts to prepare for the scheduled meeting with "Alex." ICE agents searched CI#2 and his/her car for contraband, finding none. They then gave $320.00 in official funds to CI#2 to purchase documents from "Alex," and affixed on CI#2 an electronic transmitter and recorder to monitor and record the meeting. Finally, they gave CI#2 two green card-style photographs to give to "Alex" to use on the documents.

9. At approximately 10:10 a.m. ICE agents arrived in the vicinity of Shaw's and established stationary surveillance positions to await "Alex's" arrival. At the same time, ICE agents observed CI#2 pulling into the Shaw's parking lot. CI#2 drove around the lot and eventually met with a male in a gray Pontiac Grand Prix, bearing Massachusetts Registration 92TW25. CI#2 later told me that the male in the Grand Prix identified himself as "Alex." During this meeting CI#2 entered the Grand Prix and handed "Alex" the green card style photographs and $240.00 dollars. "Alex" then advised CI#2 that the documents would be ready for delivery in approximately 1 hour. CI#2 and "Alex" agreed to meet in the Shaw's lot in approximately 1 hour.

10. At approximately 10:17 a.m. the meeting concluded and CI#2 and "Alex" exited the Shaw's parking lot. ICE agents followed "Alex" to 345 Washington Street, Weymouth, Massachusetts. I later confirmed that this is the address where the gray Pontiac is registered. "Alex" stayed at this address for approximately 10 minutes. ICE agents then followed as "Alex" drove around the Weymouth and Quincy area until he returned to the Washington Street address at approximately 11:20 a.m. At approximately 11:15 a.m., while in my presence, CI#2 received a consensually monitored and recorded telephone call from "Alex" stating that the documents would

3

not be ready for delivery for another hour.

11. At approximately 12:55 p.m., while located in the Shaw's parking lot, CI#2 received an unmonitored telephone call from "Alex." "Alex" stated that he wanted to deliver the documents in a Brazilian store named Brazuca located on Washington Street, across from 345 Washington Street.

12. At approximately 1:00 p.m. ICE agents witnessed "Alex" exit 345 Washington Street and walk directly across the street to Brazuca. At approximately 1:07 p.m. CI#2 arrived at the Brazuca parking lot and then entered the store. Once inside the store, CI#2 met with "Alex" for approximately 1 minute. After this meeting, ICE agents observed "Alex" walk directly back across the street and into 345 Washington Street.

13. I met with CI#2 after the meeting at Brazuca to debrief him/her and to obtain custody of the purchased documents. Upon inspection of the documents, I determined that the photos on one of the purchased green cards were the same photos provided earlier to CI#2. Subsequent ICE record checks revealed that all of the alien registration numbers which appeared on the green cards provided by "Alex" are either invalid or assigned to other persons.

14. Sometime after the debriefing, CI#2 received an unmonitored telephone call from "Alex," in which "Alex" offered to sell the computer system and programs he uses in making the fraudulent documents to CI#2.

**THE SECOND DOCUMENT PURCHASE**

15. On March 11, 2005, at approximately 10:07 a.m., CI#2 met with ICE agents for the purpose of making another consensually monitored and recorded telephone call to "Alex" to arrange a meeting in which CI#2 would purchase four sets of fraudulent green cards and SSANCs. CI#2 called "Alex" at (781) 901-9525 and left a voicemail message stating that he/she would meet "Alex" inside Brazuca at approximately 10:45 a.m.

16. ICE agents searched CI#2 and his/her car for contraband, finding none. They then

affixed on CI#2 an electronic transmitter and monitoring device to record and monitor the meeting. They also gave CI#2 four green card-style photographs for "Alex" to use on the fraudulent green cards, and $600.00 in official funds to use to purchase the fraudulent documents.

17. ICE agents then set up a surveillance perimeter around Brazuca and the residence located at 345 Washington Street. At approximately 10:40 a.m., ICE agents observed CI#2 and "Alex" enter Brazuca separately. ICE agents observed them leave Brazuca together approximately 10 minutes later, enter CI#2's car, drive across the street, and walk into the left door on the front porch at 345 Washington Street.

18. Once inside the residence, according to CI#2, "Alex" took CI#2 into a bedroom where two computers and a laminating machine were located, and proceeded to make four sets of fraudulent documents. CI#2 paid "Alex" $440.00 for these documents and discussed purchasing the computer and software system for $5000.00. This meeting concluded at approximately 12:43 p.m., when CI#2 exited the residence.

19. Shortly after this meeting, I met with CI#2 to debrief him/her and to obtain custody of the four sets of fraudulent documents. Upon inspection of these documents, I determined that the photos on the green cards were the same photos provided earlier. Subsequent ICE record checks revealed that all of the Alien Registration Numbers which appeared on the green cards provided by "Alex" are either invalid or assigned to other persons. CI#2 informed me that he/she told "Alex" that he/she would be in future contact to purchase the computer system for $5000.00.

20. In sum, I have a total of six documents from the above-mentioned undercover purchases. I have reviewed the documents and have determined that they are counterfeit identification documents. A review of records of ICE and the Social Security Administration reveals that all of the green cards and SSANCs are either invalid, or belong to individuals other than the person listed on the documents.

**CONCLUSION**

21. Based on the forgoing information, there is probable cause to conclude that on March 7, 2005 and again on March 11, 2005, "Alex" did, knowingly and without lawful authority, manufacture and transfer false identification documents, in violation of 18 U.S.C. 1028 (a) (2).

22. Also based on the forgoing information, I seek a search warrant for the first floor left apartment at 345 Washington Street, Weymouth, Massachusetts, because I believe probable cause exists to conclude that within that residence there are presently fruits, instrumentalities and evidence of crimes in violation of 18 U.S.C. § 1028 (a) (1).

23. A description and photograph of the first floor left apartment at 345 Washington Street, Weymouth, Massachusetts, is attached to this affidavit as "Attachment A."

24. A description of the items to be searched for and seized at 345 Washington Street, Weymouth, Massachusetts, is attached to this affidavit as "Attachment B."

Matthew J. McCarthy
Special Agent
Immigration and Customs Enforcement

Subscribed and sworn before me this 11th day of May 2005.

Marianne B. Bowler
United States Magistrate Judge
Boston, MA